**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| CASSIE KUHR and NICK KUHR, by and through their Mother and Next Friend, JEANNE KUHR, and DAN KUHR, | ) ) ) ) | CASE NO. 8:09CV363 |
| Plaintiffs, | ) ) | MEMORANDUM AND ORDER |
| vs. | ) ) | |
| MILLARD PUBLIC SCHOOL DISTRICT, and DR. KEITH LUTZ, in his capacity as Superintendent of Millard Public Schools, | ) ) ) ) ) | |
| Defendants. | ) | |

This matter is before the Court on the Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Filing No. 56) filed by Defendants Millard Public School District (MPSD) and Dr. Keith Lutz.  The Court has considered the parties' briefs (Filing Nos. 57 and 70) and the accompanying indexes of evidence (Filing Nos. 58, 71, 72, and 73).  For the reasons discussed below, Defendants Motion will be denied.

## FACTUAL BACKGROUND

Defendants have moved for dismissal under both Rule 12(c) and Rule 56, but the Court will address the factual background under only the Rule 56 standard, because Defendants' Rule 12(c) motion is a "factual attack" on Plaintiff's claim.[1]  The following uncontroverted facts are those stated in the briefs that are supported by pinpoint citations to the record, that the parties have admitted, or that the parties have not properly resisted, as required by NECivR 56.1 and Federal Rule of Civil Procedure 56.

---

[1] See the Court's discussion of the applicable standard of review, *infra*.

In the 1990s, in response to concerns over increasing incidents of gang violence, school districts, including MPSD, took steps to address the presence of gangs within schools. By 2001, the administration of Millard South High School (MSHS) was aware of the influence of several gangs within the school. Since at least 2001, police officers briefed the faculty and staff of MSHS on gang culture and gang identifiers, such as the wearing of specific colors or apparel. Several years prior to the events at issue in this case, MPSD had implemented policies prohibiting students from wearing gang-related clothing or symbols.

Defendants submitted an affidavit from Officer Bruce Ferrell, who served in the Omaha Police Department from 1988 to 2008, and in the Gang Intelligence Unit from 1999 until his retirement in January of 2008. (Filing No. 58-2, Affidavit of Bruce Ferrell ("Ferrell Aff."), at ¶ 2.) As part of his duties, Officer Ferrell provided training to MPSD staff in recognizing gang identifiers. (*Id.* at ¶ 8.) According to Officer Ferrell, gang members often wore t-shirts in honor of other members who had been "'killed in the line of duty.'" (Ferrell Aff., at ¶ 4.) Such shirts bore the words "RIP" and the gang member's name, along with a picture and the dates of birth and death. (*Id.*) Officer Ferrell covertly observed many gang funerals from 1997 to 2007 and saw such t-shirts at these funerals. (*Id.*) He stated that, in his experience, such shirts "have been worn almost exclusively by gang members or related gang associations." (*Id.*) Officer Ferrell shared this information with MPSD staff during his presentations, and also warned staff that such shirts could provoke a response from rival gang members. (*Id.* at ¶¶ 7–10.)

MSHS was not spared from gang problems. The former principal of MSHS, Jon Lopez, recounted a prior incident (he could not recall the date) where he and the Student

Resource Officer had been forced to intervene when two adult members of a local gang walked through security, seeking to intimidate and possibly harm a student.  (Filing No. 58-1, Affidavit of Jon Lopez, at ¶ 9.)  Megan Weber, a teacher at MSHS, stated that once, during the 2006–2007 school year, she had to break up a confrontation between two students who were members of rival gangs, because they were yelling at each other and threatening violence.  (Filing No. 58-4, Affidavit of Megan Weber ("Weber Aff."), at ¶ 4.)  Dr. Curtis Case, the principal of MSHS since 2006, recalled only one incident where "RIP" shirts had been worn at the school.  (Filing No. 58-3, Affidavit of Curtis Case ("Case Aff."), at ¶ 6.)  He could not recall when it had occurred, but stated that "a couple" of students wore shirts to school that honored a relative who had been "killed as part of a gang related crime."  (*Id.*)  The students complied when they were asked to remove the shirts, and there were no disruptions related to this incident.

On June 15, 2008, Julius Robinson, a young man and former MSHS student, was shot and killed by Daniel Miller, a former student of Millard West.  Omaha media covered Robinson's murder extensively.  Defendants have submitted copies of several news reports.  (Filing No. 58-3, Case Aff., Exh. 1–8, at 13–27.)  The faculty at MSHS were generally aware of these reports.

According to these reports,[2] the man that killed Robinson was a member of the "Omaha Mafia Bloods" (OMB), a group considered by Omaha police to be a street gang.  (*Id.*, Exh. 2, at 14; Exh. 3, at 17.)  In these reports, a city official and the father of one of the gang members expressed  concerns about the group's propensity for violence.  (*Id.*,

---

[2]  The Court describes these reports not for the truth their contents, but to show the information that was available to school officials at the relevant times.

3

Exh. 3, at 17.)  Robinson's friends indicated that there was a running feud between Robinson and members of OMB, many of whom had previously attended MSHS.  (*Id.*, Exh. 2, at 15.)  Robinson allegedly wrote "Fuck OMB" on his MySpace page, and a member of the OMB posted a threat in response.  (*Id.*)

Robinson's friends and family disagreed about whether Robinson had been involved with gangs.  (*Id.*, Exh. 2, at 14–15; Exh. 3, at 18.)  While his family maintained he had never been a part of any gang, some of his friends indicated he had once been a member of OMB, or at the very least, friends with some of its members.  (Exh 3, at 18.)  These friends stated that Robinson had recently stopped associating with the members of OMB, which may have been taken as "disrespect."  (*Id.*)  Robinson and his friends formed a group named "Loc'ed Out Criminals" or "LOC 228."  (*Id.*)  His friends indicated this was not an actual criminal gang, but simply a close group of friends who watched out for one another, and, in fact, tried to encourage other Millard children to leave gangs.  (*Id.*)  Police officials stated, however, that the group used many of the styles and trappings of street gangs.  (*Id.*)

Plaintiff Dan Kuhr was close friends with Robinson for several years before his murder, and Robinson's death was quite difficult for Dan.  Dan and his mother, Jeanne Kuhr, held a car wash and fish fry, and contributed the income to Robinson's family to help pay for funeral expenses.  Dan also created memorial t-shirts, key chains, and wristbands, which were sold to raise funds for Robinson's family.

The front of the memorial t-shirt contained two pictures of Robinson, one of him in his Millard football uniform, and another of him smiling and speaking on a phone.  (Filing

4

No. 71, Exh. B, Affidavit of Dan Kuhr ("Dan Aff."), at ¶¶ 6–7.)  In the background was the number "33," which had been Robinson's football number.  (*Id.*)  Above this was the text, "Julius, RIP, 6-8-90, 6-15-08."  (*Id.*)  On the back of the shirt were the words "Only God Can Judge ~~Me~~ Him Now!"  (*Id.*)  The wristbands and key-chains that Dan designed said simply, "In Loving Memory, Julius Robinson, #33."  (*Id.* at 10–11.)

Dan Kuhr did not intend the design of the shirt to convey any sort of gang-related message or to act as a "'call-out'" to any gang.  (*Id.* at ¶ 8.)  He has never been a part of any gang, and only designed the shirt to help raise money for the Robinson family.  (*Id.*)  Dan's brother and sister, Plaintiffs Nick and Cassie Kuhr, were not members of any gang or affiliated with any gang.

When the 2008 school year began in August, Dan was enrolled as a senior at the Millard Learning Center (a separate school that is part of MPSD).  Throughout August, Dan wore one of the memorial shirts to school on several occasions without incident.  Dan's brother, Nick, was at that time enrolled as a freshman at MSHS.  Nick also wore a memorial shirt to school six or seven times in the weeks prior to August 27, 2008.  Dan, Nick, and their sister Cassie, who was also enrolled at MSHS, also wore the wrist-bands to school on several occasions, also without incident.

On August 27, Megan Weber noticed (for the first time) that Nick was wearing the shirt in her class.  She believed that the shirt might be gang-related and sent an e-mail to the Assistant Principal, Brad Millard, that stated she was "worr[ied] that it showed gang ties." (Filing No. 58-4, Weber Aff.,  Exh. 1.)  Weber had attended Robinson's funeral and while there had noticed many people wearing such shirts.  She concluded the shirt was

gang-related, based on the training she had received in recognizing gang identifiers, and because she "was aware of media reports alleging Julius Robinson was a member of the LOC 228 street gang." (*Id.* at ¶¶ 2, 5–6.)

That day, MSHS administrators informed Nick that he would have to stop wearing the shirt, as it violated the school policy forbidding gang-related apparel. He was given the option of wearing another shirt over it or turning it inside-out. Nick refused, and later that day, MSHS administrators met with him, as well as Jeanne and Dan Kuhr, to discuss the situation. Nick still refused to remove the shirt, and his mother took him home for the remainder of the day. Later that same day, MSHS administrators were told that Cassie Kuhr was encouraging other students to wear the shirts the following day. Later that afternoon, Principal Case was informed that School Resources Officers in Omaha Public Schools did not allow students to wear "RIP" t-shirts for concern over their possible gang affiliations. On the morning of August 28, Case learned that the Omaha Police Department Gang Unit considered such shirts to be gang-related and considered Julius Robinson to have gang ties. On August 28, several students, including Nick Kuhr, showed up to school wearing the memorial shirts or with "RIP" written on their arms in ink. Five students were suspended for one day for refusing to change their shirts or wash off the writing. Nick was suspended for two days. At some point that day, Weber overheard students in the halls discussing their disapproval of the ban on the shirts and the possibility of a protest the following day.

On the morning of August 29, before school started, students wearing the shirts and holding signs gathered at a church across the street from the school. The students had gathered to protest the ban on the shirts and to show support for those who wished to

6

memorialize Robinson.  Principal Case became concerned that the situation was getting out of hand.  A student who had just been dropped off at school by her mother informed Case that her mother had told her to tell him that a "known gang member by the name of Pit bull" was outside the church with the students.  (Filing No. 58-3, Case Aff., at ¶ 23.)  At about the same time, a teacher informed Dr. Case that he had overheard a student telling other students that, "'If Dan hadn't shot him [Julius], I would have.  And these guys wearing these "RIP" shirts have another thing coming.'"  (*Id.*)

Case feared that members of the OMB gang might have heard about the demonstration and could be planning retaliation, such as a drive-by shooting.  He requested the presence of additional police officers, and several cruisers drove by the church.  No acts of violence occurred, nor were any gang members spotted.  When the school opened its doors, approximately thirty students entered the school, wearing the shirts, carrying "RIP Julius Robinson" signs, or bearing similar statements written on their clothing or bodies.  These students were "extremely loud and disruptive" and were asked to go to the administrators' office.  (*Id.* at 24.) Case described the situation as chaotic, with the students failing to follow the directions of staff.  (*Id.*)  This interfered with the ability of other students who needed to enter the office for other matters.  (*Id.*)  The student protestors were told to change their "RIP Julius" clothing or wash off similar marks from their bodies.  Many students complied, but twenty-six were suspended for the day for refusing to comply.

In September, Jeanne Kuhr met with Case to discuss how the t-shirt might be re-designed to assuage the school's concerns that it was gang-related.  Dr. Case refused to discuss the matter with Kuhr and told her she could appeal the suspensions of her

7

children.  She went before the Millard School Board in early September to discuss the matter.  At that meeting she told officials that Dan had still been wearing his shirt at the Millard Learning Center and that there had been no problems.  The next day Dan was told he must either remove the memorial shirt or turn it inside out, or he would have to leave the building.  Dan redesigned the shirt to remove the phrase "RIP" but he and his siblings were still prohibited from wearing it to their schools.  School officials also continued to forbid the wearing of any items bearing the name "Julius," including the wristbands Dan had designed.  At some point after this, Nick and Cassie were suspended for wearing the shirts again.[3]

Dan, Cassie, and Nick Kuhr all state that when they wore the shirts and wristbands to school, it did not disrupt school activities.  (Filing No. 71, Exh. A, Cassie Aff., at ¶¶ 8–9; Exh. B., Dan Aff., at ¶¶ 9, 12; Exh. C, Nick Aff., at ¶ 7.)  No acts or threats of violence resulted.  (*Id.*)  No hostile comments were made to them.  (*Id.*)  To the best of their knowledge, no other students experienced any violence, threats, or hostile comments either.  (*Id.*)  In fact, Nick stated that no one seemed to notice the shirt until Ms. Weber first noticed it on August 27.  (*Id.*, Nick Aff., at ¶ 7.)  Nor did anyone indicate that the shirt bothered or offended them.  (*Id.*)  Similarly, Dan stated that until he was forced to remove his shirt later in September, the shirt had not attracted notice from his fellow students.  (*Id.*, Dan Aff., at ¶ 9.)

After the filing of this case, Dan and Cassie Kuhr graduated from high school in

---

[3] Plaintiffs' affidavits do not make it clear *when* they were suspended.  (Filing No. 71, Exh. A, Affidavit of Cassie Kuhr ("Cassie Aff."), at ¶ 10; Exh. C, Affidavit of Nick Kuhr ("Nick Aff."), at ¶ 9.)  However, Plaintiffs' First Amended Complaint states that Nick and Cassie were each suspended for three days for wearing the shirts on September 2, 2008. (Filing No. 23, at ¶¶ 17–18.)

December of 2008 and February of 2010, respectively.  Nick Kuhr remained at MSHS until March of 2009, at which time Nick was transferred to Brook Valley School South, where he is currently enrolled.  Brook Valley is a separate school that provides specialized educational services to various Omaha-area public schools on a contract basis.  As a student of Brook Valley, Nick is subject to their discipline code, rules, and policies, and he is no longer subject to those of MPSD.  There are currently no plans for Nick to return to a school within MPSD.

### STANDARD OF REVIEW

**I.      Motion for Judgment on the Pleadings Under Fed. R. Civ. Proc. 12(c)**

Defendants' Motion to Dismiss (Filing No. 56) was filed after the close of pleadings. Accordingly, the Court will construe it as a Motion for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c).  The Court will review the motion under the same standard as a motion to dismiss under Rule 12(b)(1).  *See* 5A CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1367, at 218–21 (3d ed. 2004). In doing so the Court must distinguish between a "facial attack" and a "factual attack." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (quoting *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).  In a facial attack, the court "restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)."  *Id.* (citation omitted).  "In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards."  *Id.* (citations

9

omitted).  Plaintiff, as the party asserting subject matter jurisdiction, bears the burden of proof.  *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010).

Defendants present a factual attack, having submitted evidence that Plaintiffs no longer attend MPSD schools.  (Filing No. 57, Defendants' Brief in Support, at ¶¶ 32–35.) When considering a factual attack, the Court may "receive competent evidence such as affidavits, deposition testimony, and the like in order to determine the factual dispute." *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).  If this Court "determines at any time that it lacks subject-matter jurisdiction, [it] must dismiss the action."  Fed. R. Civ. Proc. 12(h)(3).

## II.    Rule 56 Motion for Summary Judgment

Summary judgment is only proper when the Court, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor, determines the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Semple v. Fed. Express Corp.*, 566 F.3d 788, 791 (8th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact."  *Id.*  Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that their claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009), *cert. denied,* 130 S. Ct. 1074 (2010) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The nonmoving party is required to demonstrate a "genuine issue of material fact" that is outcome determinative—"a dispute that might 'affect the outcome of the suit under the governing law.'" *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Thus, a "genuine issue" is more than "'some metaphysical doubt as to the material facts,'" *Nitro,* 565 F.3d at 422 (quoting *Matsushita*, 475 U.S. at 586), and "'the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Bloom*, 440 F.3d at 1028-29 (quoting *Anderson*, 477 U.S. at 247-48).

In other words, in deciding "a motion for summary judgment, [the] 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).  Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"—where there is no "genuine issue for trial"—summary judgment is appropriate. *Matsushita*, 475 U.S. at 587.

## DISCUSSION

### I.  Defendants' Motion to Dismiss for Mootness

"In order to invoke the jurisdiction of the federal courts, the parties must demonstrate an 'actual, ongoing' case or controversy within the meaning of Article III of the Constitution.  *Iron Cloud v. Sullivan*, 984 F.2d 241, 242 (8th Cir. 1993) (quoting *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477 (1990)).  The litigant asserting jurisdiction "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."  *Lewis*, 494 U.S. at 477 (citations omitted).  This requirement "subsists through all stages of federal judicial proceedings, trial and appellate."  *Id.*

Defendants argue that because Plaintiffs requested only injunctive (and declaratory) relief, and they have all either graduated or been transferred to a school not under the control of MPSD, there is no meaningful relief this Court can provide and this case is therefore moot.  Defendants are correct in stating that this Court cannot redress Plaintiffs' claims for injunctive relief.  *See, e.g.*, *DeFunis v. Odegaard*, 416 U.S. 312, 316–20 (1974) (law student's claims for injunctive relief mooted by graduation); *Cole v. Oroville Union High School Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2009) (same result for high school students).  Accordingly, those claims are moot.

However, Plaintiffs' First Amendment claim is redressable if Plaintiffs seek nominal damages and attorneys fees, and this will prevent dismissal for mootness.  *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 802 (8th Cir. 2006).  Some have questioned whether a claim for nominal damages truly presents a justiciable "case or

controversy." *See, e.g., Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1262–71(10th Cir. 2004) (McConnell, J., concurring).   However, the majority of circuits agree that a claim for nominal damages will prevent mootness. *See, e.g.*, *Id.*, at 1272 n.2 (Henry, J., concurring) (collecting cases).

Plaintiffs' complaint does not specifically request nominal damages.   Instead, in addition to injunctive relief, it requests, "all such further relief as the Court may deem just and proper."   (Filing No. 23, (First) Amended Complaint, at ¶ 29.)   However, it is not necessary to specifically request nominal damages; they will follow "automatically" if Plaintiffs prove a violation of their First Amendment rights. *Basista v. Weir,* 340 F.2d 74, 87 (3d Cir. 1965); *see also Yniguez v. Arizona*, 975 F.2d 646, 647 n.1 (9th Cir. 1992) (where complaint did not expressly request nominal damages, but requested "'all other relief that the Court deems just and proper,'" plaintiff was permitted to pursue nominal damages) (disapproved of on other grounds in *Arizonans for Official English v. Arizona*, 520 U.S. 43, 60–69 (1997)).

The Court is aware that even nominal damages may violate the principle of sovereign immunity under the Eleventh Amendment. *Hopkins v. Saunders*, 199 F.3d 968, 976–78 (8th Cir. 1999).   The Eleventh Amendment bars suits in federal courts against States and state officials, as well as government bodies that are considered "arm[s] of the state," but not against "counties and similar municipal corporations." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

However, Defendants have not raised this issue and it is not apparent from the facts before the Court that Defendant MPSD, which is a local government body, is an "arm of

13

the state," nor that Defendant Keith Lutz is a "state official."   Courts elsewhere have "almost universally found local school districts are not arms of the state," but making this determination in the present case requires facts not available to the Court.  *Wade-Lemee v. Bd. of Educ. of City of St. Louis*, 205 Fed. Appx. 477, 478–79 & n.1 (8th Cir. 2006); *cf. Cline v. Sch. Dist. No. 32 of Scotts Bluff Cnty., Neb.*, 476 F.Supp. 868, 868–70 (D. Neb. 1979) (finding a Nebraska school district was not an arm of the state).  If Defendants successfully raise sovereign immunity as a defense, the Court will need to revisit its mootness analysis.  As it stands, Plaintiffs have a viable claim for nominal damages, the case is not moot, and Defendants' Motion to Dismiss is denied.

Plaintiffs also argue that they have standing to assert the rights of other (unidentified) students under the First Amendment doctrine of "overbreadth."  The Court disagrees.  Under the overbreadth doctrine, "an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face" where the statute threatens to chill the legally protected expression of other persons not before the court. *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).  This is an exception to the ordinary rule that litigants must assert their "own legal rights and interests, and cannot rest a claim to relief on the legal rights of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).  Courts have generally recognized third-party standing where three criteria are met: (1) the litigant has suffered an injury in fact; (2) the litigant has a close relationship to the third parties; and (3) there exists some hindrance to the third parties' assertion of their rights.  *Id.* at 410–411.  Plaintiffs have not identified the other students whose rights they would assert; they have therefore failed to demonstrate a "close

14

relationship" with them.  They have also failed to present any reason these students could not assert their own rights.  Accordingly, Plaintiffs are limited to asserting violations of their own rights.

## II.   Defendants' Motion for Summary Judgment

Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  However, the First Amendment rights of students "are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986).  The Court must consider Plaintiffs' First Amendment claims "in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506.  The Court is aware that it must "enter the realm of school discipline with caution, appreciating that [its] perspective of the public schools is necessarily a more distant one than that of the individuals working within these schools." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1306 (8th Cir. 1997).

When Plaintiffs wore the memorial shirts designed by Dan, they were engaging in expressive activity (or "speech") protected by the First Amendment.  Schools may discipline students for their speech, however, if it has caused a "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 511, 514.  School officials may also "pre-emptively" discipline students or ban their speech if they have information which would reasonably lead them to forecast that the speech will cause a disruption.  *Id.*  "*Tinker* 'requires a specific and significant fear of disruption, not just some remote apprehension of disturbance,'" and schools must point to a "'well-founded expectation of disruption.'"

15

*Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 255 (4th Cir. 2003) (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211–12 (3d Cir. 2001)).

The parties agree that the case most on point is *Brown v. Cabell Cnty. Bd. of Educ.*, 714 F. Supp. 2d 587 (S.D. W. Va. 2010). There are no Eighth Circuit cases as closely on point, and the Court finds the reasoning of *Cabell* persuasive. In *Cabell*, the student plaintiff was suspended for refusing to remove the words "Free A-Train" that he had written on his hands. *Id.* at 590–91. "A-Train" referred to Anthony Jennings, a former student and known gang member, who had recently been arrested for shooting a police officer during an armed robbery. *Id.* at 588. Jennings' gang had established a presence at the school for several years, and had recently begun intimidating and assaulting fellow students, verbally assaulting staff, and causing parents to fear for their children's safety. *Id.* at 589. Just two weeks prior to the incident giving rise to the case, gang members traveled by school bus to another student's home and fought with him and his family, then two days later threatened to shoot two students in the back of the head. *Id.*

After Jenning's arrest, several students, including members of Jenning's gang, began wearing shirts to school that bore the words "Free A-Train," and otherwise disrupting school activities with displays of support for Jennings. *Id.* School authorities received an "'onslaught'" of calls from concerned parents. *Id.* Some were concerned about rumors that gang members would bring guns to school, others that the "Free A-Train" slogans were intimidating to children. *Id.* Some parents even considered pulling their children from school until their safety could be guaranteed. *Id.* The school decided to ban all displays of the slogan, and the plaintiff was suspended for violating the ban. *Id.* at 590.

16

The *Cabell* court granted the defendant school district's motion for summary judgment, holding that it had not violated the plaintiff's First Amendment rights. The critical issue in the case was the basis for the school's belief that the slogan could lead to a substantial disruption of or interference with school activities. *Id.* at 594. It did not matter that the plaintiff himself was not a gang-member, that he presented no threat of violence, nor that his particular display of the slogan was "passive and peaceful." *Id.* at 591, 596. The specific circumstances of the plaintiff's display of the slogan did not matter, "because it took place in a larger context of hostility and intimidation." *Id.* at 596. Because there was "evidence of a potentially disruptive gang presence," the ban was reasonable, so long as the gang symbols or clothing banned were "clearly associated with gang related disturbances, so that future disruption[s could] be reasonably anticipated." *Id.* at 593. The critical inquiry in this case is what school officials knew, and the basis for that knowledge, at the time they disciplined Plaintiffs and banned all displays of memorials in honor of Julius Robinson. The Court recognizes that school officials must be able to act quickly on the information they have, particularly if students' safety is at issue.

Plaintiffs argue that because they did not intend the shirts to convey any gang-related message, "Defendants cannot establish the display of those t-shirts would have caused gang-related violence." (Filing No. 70, Plaintiffs' Brief in Opposition, at 15.) This is wrong, as a matter of law and common sense. The ultimate issue in this case is whether the shirts were likely to interfere with school activities, including, but not limited to, the possibility of threats or acts of gang violence. If school officials have reliable information from which they can reasonably forecast that certain speech could lead to acts of gang

17

violence, it does not matter whether the speech at issue is itself gang-related.  *Cf. B.W.A.*

*v. Farmington R-7 Sch. Dist.*, 508 F. Supp. 2d 740, 749–50 (E.D. Mo. 2007) (school need

only meet *Tinker* standard to ban wearing of Confederate flags; whether the student in

question viewed the expression as racist is "largely irrelevant" and school need not prove

that the particular incident was race-related).  However, on the evidence before the Court,

a reasonable jury could find that Defendants were *not* in possession of such information

at the relevant times.  Under the reasoning of *Tinker* and *Cabell*, Defendants' Motion for

Summary Judgment must be denied.

## A.    Potential Violations of Plaintiffs' First Amendment Rights Occurring on August 27 and 28

Defendants have shown that by August 27, MPSD officials were aware of the

following information.  Julius Robinson, a former Millard student, had been murdered

approximately two months prior by gang members.  MPSD staff were generally aware of

the reports concerning Robinson's murder.  MPSD staff had been briefed generally on

identifying gang symbols and apparel, and understood the possible gang connotations of

"RIP" t-shirts.  (Filing No. 58-2, Ferrell Aff., at ¶¶ 7–8; Filing No. 58-3, Case Aff., at ¶¶ 6–8,

14; Filing No. 58-4, Weber Aff., at ¶¶ 2, 5–6, & Exh. 1.)  MPSD officials had also been

informed, prior to Robinson's death, that there was significant animosity between the OMB

gang and the LOC 228 group.  (Ferrell Aff., at ¶ 11.)  On August 27, when Weber first

noticed that Nick Kuhr was wearing a memorial shirt, she "worr[ied]" that the shirt was

gang-related, based on her prior training in identifying gang symbols and the news reports

concerning Robinson's death.  (Weber Aff., at ¶¶ 2, 5–6, & Exh. 1.)  At that point, Nick had

worn the shirt for several days without incident.

By the second day, August 28, the information available to school officials had changed little. Case knew that other schools in Omaha prohibited "RIP" t-shirts as gang-related apparel, and knew that the Omaha Police Department Gang Unit considered such shirts (in general) to have gang ties, and considered Robinson to have gang ties. (Filing No. 58-3, Case Aff., at ¶ 19.) That day, six more students (including Nick Kuhr) were suspended for wearing the shirts. Defendants have presented no evidence that these students caused a disruption or were likely to cause a disruption. To the contrary, the affidavits of Nick, Cassie, and Dan Kuhr state that there were no disruptions or even hostile comments. (Filing No. 71, Exh. A, Cassie Aff., at ¶¶ 8–9; Exh. B, Dan Aff., at ¶¶ 9, 12; Exh. C, Nick Aff., at ¶ 7.)

Case stated that *after* suspending those six students, he was informed that students were planning to protest and possibly block the entrance of the school while wearing the shirts and carrying signs in support of Robinson. (Case Aff., at ¶ 21.) Weber stated that while patrolling the hallways between classes, she overheard students engaged in "animated discussions about a planned protest," and she noticed that students appeared to be interested in how much disruption this might cause, and that they felt the ban was unfair. (Weber Aff., at ¶ 7.) She does not state *when* she overheard these discussions. Defendants do not claim that it was disruptive for these students to talk in the hallways between classes.

A reasonable jury could find that Defendants failed to demonstrate that school officials had anything more than an undifferentiated and remote apprehension of a disturbance when they suspended Nick Kuhr on August 28. The fact that Nick had worn his shirts for several days without incident supports a finding that no disruption was likely

19

to result.  A jury could make this finding despite Julius Robinson's murder.  Robinson's murder occurred two months prior, off campus, after he had graduated.  Defendants have not shown that they knew any then-current Millard students were involved.  Defendants have failed to present specific facts suggesting that any gang violence by members of the OMB or LOC 228 was likely to occur at MSHS.

In *Cabell*, school officials banned speech that occurred in a "larger context of hostility and intimidation."  714 F. Supp. 2d at 596.  By contrast, in the present case, questions of fact remain whether Plaintiffs' speech occurred in a context likely to provoke gang violence or other disruptions of school activities.  Defendants have pointed to two incidents in past years involving gangs, but neither incident involved OMB or LOC 228 members.  Nor have Defendants presented any evidence of these groups causing problems at MSHS.  The only other time students wore "RIP" shirts to school, they removed them without complaint.  There was no evidence that any disruption resulted or that school officials were afraid one might result.  Based on the above facts, a reasonable jury could infer that the displays of support for Robinson at MSHS occurred in a context unlikely to provoke gang violence.  Accordingly, as to any violations of Plaintiffs' First Amendment rights that occurred on or before August 28, Defendants' Motion for Summary Judgment must be denied.

**B.    Potential Violations of Plaintiffs' First Amendment Rights Occurring on or After August 29, 2008**

Neither party has stated, nor produced evidence, that any of the Plaintiffs were present at the protests on August 29 or disciplined as a result of the events of that day.  Plaintiffs are limited to seeking nominal damages for violations of *their* First Amendment

20

rights.  Therefore it is not for this Court to determine whether MPSD officials acted properly in responding to the protests on the morning of August 29.

There remains the question, however, of whether school officials violated Plaintiffs' First Amendment rights *following* the protest on August 29, by maintaining an (apparently) indefinite ban on all memorial displays for Julius Robinson.  This ban included the key-chains, wristbands, and the original shirts, as well as new shirts with the phrase "RIP" removed.  The evidence and briefs before the Court focus on the events of August 29.  Accordingly, the Court cannot determine whether an indefinite ban on displays of support for Robinson was reasonable.  Finally, Defendants have not presented evidence or arguments as to why it was necessary to force Dan Kuhr to remove his shirt, weeks after the protest, when no one at the Millard Learning Center apparently had noticed or been bothered.  Accordingly, Defendants' Motion for Summary Judgment is denied as to any violations of Plaintiffs' rights occurring on or after August 29, 2011.

## CONCLUSION

Plaintiffs have viable claims for nominal damages and attorney's fees that  prevent dismissal for mootness.  A  reasonable jury could find that Defendants violated Plaintiffs' First Amendment rights by banning all displays in honor or Robinson and suspending Plaintiffs Nick and Cassie Kuhr for wearing shirts in honor of Robinson.

Accordingly,

IT IS ORDERED:

1.      The Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Filing No. 56) filed by Defendants Millard Public School District and Dr. Keith Lutz is denied, and

21

2.      Plaintiffs' Motion to Exclude Evidence under Fed. R. Civ. P. 37 (Filing No. 63)

is denied as moot.

DATED this 8th day of November, 2011.

BY THE COURT:


s/Laurie Smith Camp
United States District Judge